UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FILED IN OPEN COURT
6·17·2020
CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

UNITED STATES OF AMERICA

v.

JORGE PEREZ,
RICARDO PEREZ,
SETH GUTERMAN,
AARON DURALL,
JAMES F. PORTER, JR.,
SEAN PORTER,
CHRISTIAN FLETCHER,
NEISHA ZAFFUTO,
AARON ALONZO, and
NESTOR ROJAS

Case No. 3:20-cr-86-J-34 PDB
18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 1956(h)
18 U.S.C. § 1956(a)(1)(A)(i)
18 U.S.C. § 1957

INDICTMENT

The Grand Jury charges:

## COUNT ONE
### (Conspiracy)

### A. Introduction

At times material to this Indictment,

Defendants, Related Companies, and Individuals

1.     Defendant JORGE PEREZ was a resident of Miami, Florida.  At various times, JORGE PEREZ managed and controlled Campbellton-Graceville Hospital ("Campbellton-Graceville"), Regional General Hospital Williston ("Williston"), and Putnam County Memorial Hospital ("Putnam County").  JORGE

PEREZ also owned and controlled Empower H.I.S., LLC ("Empower"), a medical

billing and software company with its principal place of business in Miami-Dade

County, Empower Investment Group, LLC ("Empower Investment"), and Hospital

Partners, Inc. ("Hospital Partners").

2.      Defendant RICARDO PEREZ was a resident of Miami, Florida.

RICARDO PEREZ was employed by Empower, and owned and controlled Empower

Investment.  RICARDO PEREZ and JORGE PEREZ were brothers.

3.      Defendant SETH GUTERMAN was a resident of Chicago, Illinois.

GUTERMAN owned and controlled People's Choice Hospital ("People's Choice"), a

hospital management company with its principal place of business in Chicago, and at

various times managed and controlled Campbellton-Graceville.

4.      Defendant AARON DURALL was a resident of Parkland, Florida.

DURALL owned and controlled Reliance Laboratory Testing Inc. ("Reliance"), a

clinical testing laboratory that performed toxicology testing on urine samples, and had

its principal place of business in Sunrise, Florida.  DURALL also owned and

controlled Durall Capital Holdings, LLC ("Durall Capital") and DL Investment

Holdings, LLC ("DL Investment").

5.      Defendant JAMES F. PORTER, JR. ("JAMES PORTER") was a

resident of Ocala, Florida.  JAMES PORTER owned and controlled RAJ Enterprises

of Central Florida, LLC d/b/a Pinnacle Laboratories ("Pinnacle"), a clinical testing

laboratory that performed toxicology testing on urine samples, and had its principal

place of business in Ocala, Florida, in the Middle District of Florida. JAMES

PORTER also served as the manager of Hospital Laboratory Partners, LLC ("HLP"),

a Florida corporation.

6.     Defendant SEAN PORTER was a resident of Crystal River, Florida.

SEAN PORTER owned and controlled TYSI LLC, a Florida corporation.

7.     Defendant CHRISTIAN FLETCHER was a resident of Atlanta,

Georgia. FLETCHER owned and controlled Lifebrite Laboratories, Inc.

("Lifebrite"), a clinical testing laboratory that performed toxicology testing on urine

samples, and had its principal place of business in Atlanta, Georgia.

8.     Defendant NEISHA ZAFFUTO was a resident of Miami, Florida.

ZAFFUTO owned and controlled Medivance Billing Services ("Medivance"), a

medical billing company with its principal place of business in Miami, Florida.

9.     Defendant AARON ALONZO was a resident of Miami, Florida.

ALONZO owned and controlled CGH Holdings Company, Inc. ("CGH Holdings"),

a Florida corporation.

10.     Defendant NESTOR ROJAS was a resident of Miami, Florida. ROJAS

was a listed principal of CGH Holdings.

11.     Billing Company A, a medical billing company, was a Florida

corporation with its principal place of business in Miami-Dade County, Florida.

12.     Co-conspirator David Byrns was a resident of Lighthouse Point, Florida.

Byrns and JORGE PEREZ owned and controlled Hospital Partners.

13.     Co-conspirator Kyle Marcotte was a resident of Atlantic Beach, Florida. Marcotte was an operator of Beaches Recovery, a substance abuse treatment facility located in Jacksonville, Florida, a manager of North Florida Labs, LLC ("North Florida"), a Florida limited liability corporation, and the sole owner of KTL Labs, LLC ("KTL Labs"), a Florida limited liability corporation.

14.     Individual-1 was a resident of Georgia.

<u>The Rural Hospitals</u>

15.     Campbellton-Graceville was a 25-bed hospital located in Graceville, Florida. Campbellton Graceville was owned by the Campbellton-Graceville Hospital Corporation ("CGH Corporation"), a not-for-profit entity created by the State of Florida. CGH Corporation filed for bankruptcy protection in the United States Bankruptcy Court for the Northern District of Florida in or about May 2017, leading to closure of the hospital.

16.     Williston was a 40-bed hospital located in Williston, Florida. Williston was a for-profit hospital owned by Regional Health Partners, LLC, a Florida corporation. The Florida Agency for Health Care Administration, which regulates hospitals in Florida, declined to renew Williston's license in or about July 2019, leading to closure of the hospital.

17.     Chestatee Regional was a 49-bed hospital located in Dahlonega, Georgia. In or about August 2016, Durall Capital Holdings purchased the assets of

4

18.     Chestatee Regional.  Chestatee Regional was sold in 2018 and shut down in or about July 2018.

19.     Putnam County was a 15-bed hospital located in Unionville, Missouri. Putnam County was a public entity created under Missouri law, and was governed by a Board of Trustees.

20.     Campbellton-Graceville, Williston, Chestatee Regional, and Putnam County (collectively, the "Rural Hospitals") offered, among other services, inpatient and outpatient medical care, specialty clinics, and emergency services.  Each of the Rural Hospitals had laboratory facilities equipped to conduct a variety of diagnostic tests, as ordered by qualified medical professionals, for inpatients and outpatients of the hospital.

21.     Campbellton-Graceville and Putnam County were designated as Critical Access Hospitals ("CAHs"), a designation established under the Balanced Budget Act of 1997 to improve the financial viability of rural hospitals and promote access to healthcare in rural communities.  To qualify as a CAH, a hospital was required to, among other things, have 25 or fewer beds, be located in a rural area as defined by applicable regulations, maintain an annual average length of stay of 96 hours or less for acute care patients, and provide a 24/7 emergency room.  CAHs received favorable Medicare reimbursement rates and could take advantage of other benefits under the Medicare program designed to maintain their financial strength.

22.     Each of the Rural Hospitals had a National Provider Identification ("NPI") number.  An NPI number was a unique 10-digit number assigned to each individual and institutional health care provider by the Centers for Medicare and Medicaid Services ("CMS").

Urine Analysis ("UA") and Blood Testing

23.     Individuals receiving treatment for abuse of substances such as drugs or alcohol, as well as individuals taking certain prescription medications under the direction of a physician, typically submitted to regular urine analysis testing ("UA testing") to detect recent drug or alcohol use.

24.     UA testing ranged in complexity from screening tests—also known as qualitative or point of care tests—which provided instant results, to confirmatory tests, also known as quantitative tests, which involved more complex analysis.

25.     Screening UA tests were inexpensive; could be performed at a substance abuse treatment facility, a doctor's office, or a laboratory; and identified only the presence or absence of a substance in the patient's system.  Confirmatory UA tests had to be conducted in a laboratory setting using more sophisticated testing equipment capable of accurately and definitively identifying specific substances and the quantitative concentrations of the drugs or their metabolites. Confirmatory UA tests were more precise, more sensitive, and detected more substances than screening UA tests.  Confirmatory UA tests were more expensive to process and therefore were typically reimbursed by insurance companies at higher rates than screening UA tests.

6

26.     Blood tests were tests performed at a laboratory on the blood specimens of patients.

27.     None of the Rural Hospitals had the equipment or laboratory capacity to conduct large-scale confirmatory UA tests or blood tests.

The Health Insurance Programs

28.     Florida Blue (a Florida-headquartered licensee of the Blue Cross and Blue Shield Association) ("Florida Blue"), Blue Cross Blue Shield of Georgia (a Georgia-headquartered licensee of the Blue Cross and Blue Shield Association) ("BCBS Georgia"), RightCHOICE Managed Care, Inc. (a Missouri-headquartered licensee of the Blue Cross and Blue Shield Association) ("RightCHOICE"), United HealthCare, Inc. ("UHC"), and Aetna Inc. ("Aetna") (collectively, the "Private Insurers") were private insurance companies and, along with numerous other private insurance companies, offered individual and group health benefit plans and served as third-party administrators for self-insured health plans.

29.     The Federal Employees Health Benefit Program ("FEHBP") provided medical benefits, items, and services to federal employees, retirees, and eligible spouses and dependents.  The United States Office of Personnel Management ("OPM") administered FEHBP and contracted with a number of private insurance carriers, including the Private Insurers, to process and pay health care claims on behalf of OPM.

30.     The Private Insurers and FEHBP, as well as other private insurance companies that reimbursed the Rural Hospitals as described in this Indictment, were each a "health care benefit program" as defined by 18 U.S.C. § 24(b), that is, "public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual."

31.     The Private Insurers and other private insurance companies entered into contracts with health care providers in Florida, Georgia, Missouri, and other states, including hospitals, under which the Private Insurers agreed to reimburse the health care providers at negotiated rates for items and services provided to individuals (known as "Members" or "Subscribers") insured under the health insurance plans provided or administered by the Private Insurers.

32.     Providers with which the Private Insurers and other private insurance companies had such contracts were generally referred to as "in-network" providers with those insurers. Providers with which the Private Insurers did not have contracts were generally referred to as "out-of-network" providers with those insurers, and were reimbursed at substantially lower rates, or not at all, for providing services comparable to in-network providers.

33.     Each of the Rural Hospitals entered into contracts with each of the Private Insurers (each, an "Insurance Contract"), and with other private insurance companies, under which the insurers agreed to reimburse the Rural Hospitals for providing a defined set of health care items and services, including laboratory testing

8

services, to the insurers' Members and Subscribers. The Rural Hospitals were considered "in-network" providers with respect to each insurer with which they had a contract.

34.     Under the terms of the insurance contracts and consistent with state and federal law, the Private Insurers were only responsible for claims for services that: (a) were medically necessary and actually rendered, (b) were provided by a properly licensed service provider, and (c) complied with the terms of the health care plans. The Private Insurers provided high rates of reimbursement for laboratory testing services and other medical services under their contracts with the Rural Hospitals due to the Rural Hospitals' status as CAHs and their location in rural parts of the country, and in order to promote the hospitals' financial viability and ensure access to health care services for Members and Subscribers.

35.     To obtain payment from the Private Insurers and other private insurance companies, the Rural Hospitals, or their designees, submitted claims, either electronically or on paper, that included, among other material information, the Rural Hospitals' NPI number and tax ID, the patient's name, the patient's diagnosis described by standardized codes, a description of the service(s) rendered to the patient using standardized codes, the date the services were rendered, and the amount claimed for payment.

### B.   The Conspiracy

36.     Beginning at least in or about May 2015, and continuing until in or about February 2018, in the Middle District of Florida, and elsewhere, the defendants,

JORGE PEREZ,
RICARDO PEREZ,
SETH GUTERMAN,
AARON DURALL,
JAMES PORTER,
CHRISTIAN FLETCHER,
NEISHA ZAFFUTO,
AARON ALONZO, and
NESTOR ROJAS,

did knowingly and willfully combine, conspire, confederate, and agree with each other and others known and unknown to the Grand Jury:

a.     to knowingly and willfully execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in 18 U.S.C. § 24(b), that is, the Private Insurers, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of 18 U.S.C. § 1347; and

b.     to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made,

10

and for the purpose of executing such scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343.

### C. Manner and Means of the Conspiracy

37. The manner and means by which the defendants and their co-conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

a. It was part of the conspiracy that JORGE PEREZ, SETH GUTERMAN, AARON DURALL, CHRISTIAN FLETCHER, and others would and did research and identify financially distressed CAHs and rural hospitals in the United States over which they could obtain ownership and control for the purpose of billing false and fraudulent claims for laboratory testing under the hospitals' in-network contracts, even though such testing took place at independent laboratories on behalf of patients with no connection to the hospitals.

b. It was further a part of the conspiracy that certain conspirators would and did gain control over the operations of the Rural Hospitals, including control over their bank accounts, billing systems, and their right to submit claims to insurance companies with which the Rural Hospitals had in-network contracts, in the following manner:

11

i. JORGE PEREZ and SETH GUTERMAN obtained control over Campbellton-Graceville in or about May 2015 by entering into a management agreement with the Campbellton-Graceville Board;

ii. JORGE PEREZ obtained control over Williston in or about February 2016 by entering into an agreement with the owners of the hospital;

iii. JORGE PEREZ and David Byrns obtained control over Putnam County in or about September 2016 by entering into a management agreement with the Putnam County Board; and

iv. AARON DURALL obtained control over Chestatee Regional by acquiring the hospital, through Durall Capital, in or about September 2016.

c. It was further a part of the conspiracy that JORGE PEREZ would and did cause software to be installed at Campbellton-Graceville, Williston, and Putnam County that enabled the hospitals' laboratories to transmit patient billing information and associated data by wire to Empower in Miami, Florida, for the purpose of submitting insurance claims to the Private Insurers and other third-party payors.

d. It was further a part of the conspiracy that AARON DURALL would and did engage NEISHA ZAFFUTO and her billing company, Medivance, to submit claims for screening and confirmatory UA tests, on behalf of Chestatee Regional, to third-party payors, including the Private Insurers.

e.     It was further a part of the conspiracy that AARON DURALL would and did engage JORGE PEREZ to install and cause to be installed new information technology systems at Chestatee Regional, including a lab information system that enabled the transmission of patient billing information and associated data by wire from Chestatee Regional to Medivance's location in South Florida, for the purpose of submitting insurance claims to the Private Insurers and other third-party payors.

f.     It was further a part of the conspiracy that JORGE PEREZ and RICARDO PEREZ would and did arrange for either Empower or Billing Company A to submit claims for screening and confirmatory UA tests and blood tests, on behalf of Campbellton-Graceville, Williston, and Putnam, to third-party payors, including the Private Insurers.

g.     It was further a part of the conspiracy that JORGE PEREZ, SETH GUTERMAN, AARON DURALL, JAMES PORTER, CHRISTIAN FLETCHER, AARON ALONZO, and NESTOR ROJAS would and did cause Reliance, Pinnacle, Lifebrite, and other independent testing laboratories to obtain urine and blood samples from individuals residing throughout the United States who were not inpatients or outpatients of Campbellton-Graceville, Williston, Chestatee Regional, or Putnam County, and who otherwise had no connection to the Rural Hospitals, and to perform screening and confirmatory UA tests and blood tests on the samples.

13

h.     It was further a part of the conspiracy that AARON ALONZO
and NESTOR ROJAS would and did recruit independent laboratories to conduct
confirmatory UA tests that were fraudulently billed through Campbellton-Graceville.

i.     It was further a part of the conspiracy that AARON ALONZO
and NESTOR ROJAS established CGH Holdings as a vehicle to divert insurance
reimbursements from Campbellton-Graceville to the independent laboratories.

j.     It was further a part of the conspiracy that JORGE PEREZ,
RICARDO PEREZ, SETH GUTERMAN, AARON DURALL, JAMES PORTER,
CHRISTIAN FLETCHER, NEISHA ZAFFUTO, AARON ALONZO, and
NESTOR ROJAS would and did cause false and fraudulent claims for reimbursement
of the aforementioned screening and confirmatory UA test and blood tests to be
submitted to the Private Insurers and other private payors using the NPI and other
identifying information for the Rural Hospitals, as though the testing was
reimbursable under the Rural Hospitals' insurance contracts with the Private Insurers
and other third-party payors, when in truth and in fact, it was not.

k.     It was further a part of the conspiracy that JORGE PEREZ,
RICARDO PEREZ, SETH GUTERMAN, AARON DURALL, JAMES PORTER,
CHRISTIAN FLETCHER, NEISHA ZAFFUTO, AARON ALONZO, NESTOR
ROJAS, and their co-conspirators, would and did submit, and cause the submission,
through Empower, Billing Company A, and Medivance, of materially false and
fraudulent claims for reimbursement to the Private Insurers and other private payors,

in that the claims for testing performed at Reliance, Pinnacle, Lifebrite, and other independent laboratories were purportedly submitted pursuant to Campbellton-Graceville, Williston, Chestatee Regional, and Putnam County's in-network contracts under which reimbursement was available for testing performed for hospital patients, but, in truth and in fact, these claims were for testing that was not medically necessary and not reimbursable under the contracts.

l. It was a further part of the conspiracy that JORGE PEREZ, SETH GUTERMAN, RICARDO PEREZ, AARON DURALL, JAMES PORTER, CHRISTIAN FLETCHER, NEISHA ZAFFUTO, AARON ALONZO, NESTOR ROJAS, and their co-conspirators, would and did cause the materially false and fraudulent claims to be submitted to the Private Insurers and other third-party payors in order to take advantage of Campbellton-Graceville, Williston, Chestatee Regional, and Putnam County's in-network contracts, under which the Rural Hospitals were reimbursed at significantly higher rates than the out-of-network, independent laboratories where most of the testing took place.

m. It was further a part of the conspiracy that JORGE PEREZ and AARON DURALL would and did pay and cause to be paid kickbacks to recruiters, including Individual-1 and co-conspirator Kyle Marcotte, to induce the solicitation and referral of urine samples that could be tested at outside laboratories and falsely and fraudulently billed through Campbellton-Graceville, Williston, Chestatee Regional, and Putnam County's, by paying such recruiters a portion of the insurance

reimbursements the Rural Hospitals obtained from the Private Insurers and other third-party payors.

n.        It was further a part of the conspiracy that JORGE PEREZ, RICARDO PEREZ, SETH GUTERMAN, and their co-conspirators would and did cause a portion of the reimbursements received by Campbellton-Graceville, Williston, Chestatee Regional, and Putnam County to be transferred to companies controlled by AARON DURALL, JAMES PORTER, CHRISTIAN FLETCHER, AARON ALONZO, and NESTOR ROJAS to compensate them for performing and arranging for the performance of the testing billed through the Rural Hospitals.

o.        It was further a part of the conspiracy that the conspirators would and did cause the materially false and fraudulent claims to be submitted by wire transmission by Empower, Billing Company A and Medivance, in Miami, Florida, to Florida Blue, in Jacksonville, Florida, in the Middle District of Florida, and to BCBS Georgia, RightCHOICE Managed Care, UHC, Aetna, and other private insurers, in interstate commerce.

p.        It was further a part of the conspiracy that JORGE PEREZ, RICARDO PEREZ, SETH GUTERMAN, AARON DURALL, JAMES PORTER, CHRISTIAN FLETCHER, NEISHA ZAFFUTO, AARON ALONZO, NESTOR ROJAS, and their co-conspirators, through the use of interstate wires, would and did cause the Private Insurers to make payments to Campbellton-Graceville, Williston, Chestatee Regional, and Putnam County for screening and confirmatory UA tests and

16

blood tests that were medically unnecessary, not reimbursable under the contracts, and obtained through materially false and fraudulent representations.

      q.    It was a further part of the conspiracy that, after BCBS Georgia placed Chestatee Regional on a "pre-payment review" in which BCBS Georgia would review all laboratory claims before determining whether to pay them, AARON DURALL and NEISHA ZAFFUTO would and did submit, and caused to be submitted, false and fraudulent claims in a manner designed to conceal the fact that UA tests had been performed, namely, by submitting generic diagnosis codes that made no mention of drug treatment.

      r.    It was a further part of the conspiracy that JORGE PEREZ and JAMES PORTER would and did establish HLP and create a sham agreement under which HLP purported to manage the Putnam County lab, when in truth and in fact, HLP served as a vehicle to receive and distribute the proceeds derived from falsely and fraudulently billing the Private Insurers and other third-party payors, through Putnam County, for laboratory testing services.

      s.    It was a further part of the conspiracy that the conspirators would and did participate in meetings, perform acts, and make statements to accomplish the objects of and to conceal the conspiracy.

      t.    It was a further part of the conspiracy that the conspirators caused Campbellton-Graceville, Williston, Putnam County, and Chestatee Regional to

submit approximately $1.4 billion in false and fraudulent claims to the Private Insurers for UA and blood testing, and to be reimbursed approximately $400 million.

All in violation of 18 U.S.C. § 1349.

## COUNTS TWO THROUGH SIX
### (Health Care Fraud)

### A.    Introduction

1.    The Grand Jury realleges and incorporates by reference the paragraphs contained in Section A of Count One of this Indictment as though fully set forth herein.

### B.    The Scheme

2.    Beginning in or about November 2015, and continuing until in or about February 2018, in the Middle District of Florida, and elsewhere, the defendants,

JORGE PEREZ,
RICARDO PEREZ,
SETH GUTERMAN, and
AARON DURALL,

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully devise and execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined by 18 U.S.C. § 24(b), that is, Florida Blue, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program.

18

## C.   <u>The Manner and Means of the Scheme</u>

3.     The manner and means of the scheme and artifice is described in Section C of Count One of this Indictment, and the Grand Jury realleges and incorporates by reference that section as though fully set forth herein.

## D.   <u>Execution of the Scheme</u>

4.     On or about the dates set forth below in each count, within the Middle District of Florida, and elsewhere, the defendants, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program affecting commerce, as defined in 18 U.S.C. § 24(b), that is, Florida Blue, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in that the defendants submitted and caused the submission of false and fraudulent claims to the insurers identified below, seeking the identified dollar amounts, representing that the services were reimbursable under the hospitals' contracts and were medically necessary:

| Count | Approximate Claim Receipt Date | Beneficiary | Services Billed | Amount Billed | Amount Paid | Claim Number | Insurer |
|-------|-------------------------------|-------------|-----------------|---------------|-------------|--------------|---------|
| TWO | December 17, 2015 | A.S. | Lab tests | $4,384.00 | $3,068.80 | 776994261 | Florida Blue |
| THREE | December 17, 2015 | M.J. | Lab tests | $7,107.00 | $2,179.39 | H100000506 702235 | Florida Blue |
| FOUR | December 21, 2015 | H.F. | Lab tests | $4,774.00 | $1,398.49 | Q100000507 259093 | Florida Blue |

| Count | Approximate Claim Receipt Date | Beneficiary | Services Billed | Amount Billed | Amount Paid | Claim Number | Insurer |
|-------|-------------------------------|-------------|-----------------|---------------|-------------|--------------|---------|
| FIVE | March 9, 2016 | J.R. | Lab tests | $5,190.00 | $1,502.84 | H100000521 080417 | Florida Blue |
| SIX | May 10, 2016 | S.D. | Lab tests | $5,190.00 | $1,051.98 | Q100000532 731632 | Florida Blue |

In violation of 18 U.S.C. §§ 1347 and 2.

### COUNT SEVEN
### (Conspiracy to Commit Money Laundering)

#### A.     Introduction

1.     The Grand Jury realleges and incorporates by reference the paragraphs contained in Sections A and C of Count One of this Indictment as though fully set forth herein.

#### B.     The Conspiracy

2.     Beginning in or about September 2016, and continuing until in or about February 2018, in the Middle District of Florida, and elsewhere, the defendants,

AARON DURALL
and
NEISHA ZAFFUTO,

did knowingly and intentionally combine, conspire, confederate, and agree with each other, Kyle Marcotte, and with others known and unknown to the Grand Jury:

a.     to knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which financial transaction involved the proceeds of specified unlawful activity, knowing that the property involved in the

20

financial transaction represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i); and

b.     to knowingly engage and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000, and is derived from specified unlawful activity, within the United States, in violation of 18 U.S.C. § 1957(a).

It is further alleged that the specified unlawful activities are conspiracy to commit health care fraud and wire fraud, and health care fraud, in violation of 18 U.S.C. §§ 1349 and 1347.

All in violation of 18 U.S.C. § 1956(h).

## COUNT EIGHT
### (Conspiracy to Commit Money Laundering)

### A.     Introduction

1.     The Grand Jury realleges and incorporates by reference the paragraphs contained in Sections A and C of Count One of this Indictment as though fully set forth herein.

### B.     The Conspiracy

2.     Beginning in or about November 2015, and continuing until in or about February 2018, in the Middle District of Florida, and elsewhere, the defendants,

JORGE PEREZ,
RICARDO PEREZ,
SETH GUTERMAN,

21

JAMES F. PORTER, JR.,
SEAN PORTER,
CHRISTIAN FLETCHER,
AARON DURALL, and
NEISHA ZAFFUTO,

did knowingly and intentionally combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury, to knowingly engage and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000, and is derived from specified unlawful activity, within the United States, in violation of 18 U.S.C. § 1957(a).

It is further alleged that the specified unlawful activities are conspiracy to commit health care fraud and wire fraud, and health care fraud, in violation of 18 U.S.C. §§ 1349 and 1347.

In violation of 18 U.S.C. § 1956(h).

## COUNTS NINE AND TEN
### (Money Laundering)

### A.    Introduction

1.    The Grand Jury realleges and incorporates by reference the paragraphs contained in Sections A and C of Count One of this Indictment as though fully set forth herein.

### B.    Offense

2.    On or about the dates listed below in each count, in the Middle District of Florida, and elsewhere, the defendant,

AARON DURALL,

22

did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which financial transaction involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of specified unlawful activity:

| Count | Approximate Date of Payment | Approximate Amount | Description |
|-------|------------------------------|---------------------|-------------|
| NINE | November 30, 2016 | $515,095 | Transfer from BB&T account ending in 5818, in the name of Reliance Laboratory Testing, Inc. to JPMorgan Chase account ending in 1275 held in the name of North Florida Labs, LLC |
| TEN | February 2, 2017 | $1,027,017 | Transfer from BB&T account ending in 5818, in the name of Reliance Laboratory Testing, Inc. to JPMorgan Chase account ending in 2011 in the name of KTL Labs, LLC |

It is further alleged that the specified unlawful activities are conspiracy to commit health care fraud and wire fraud, and health care fraud, in violation of 18 U.S.C. §§ 1349 and 1347.

In violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2.

**COUNTS ELEVEN THROUGH TWENTY-THREE**
**(Money Laundering)**

**A.   Introduction**

1.   The Grand Jury realleges and incorporates by reference the paragraphs

contained in Sections A and C of Count One of this Indictment as though fully set forth herein.

**B.**     **Offense**

2.     On or about the dates listed below in each count, in the Middle District of Florida, and elsewhere, the defendants,

JORGE PEREZ,
RICARDO PEREZ,
SETH GUTERMAN,
AARON DURALL,
NEISHA ZAFFUTO,
JAMES F. PORTER, JR.,
SEAN PORTER, and
CHRISTIAN FLETCHER,

did knowingly engage in and attempt to engage in a monetary transaction by, through, and to a financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000, and such property having been derived from specified unlawful activity, as set forth below:

| Count | Defendant | Approximate Date of Payment | Approximate Amount | Description |
|---|---|---|---|---|
| ELEVEN | JAMES PORTER, JR. <br><br> JORGE PEREZ <br><br> RICARDO PEREZ | January 10, 2017 | $500,000 | Transfer from Gateway Bank of Central FL account ending in 4841, in the name of Hospital Laboratory Partners to TD Bank account ending in 9018 in the name of Empower HIS, LLC |

| Count | Defendant | Approximate Date of Payment | Approximate Amount | Description |
|---|---|---|---|---|
| TWELVE | JAMES PORTER, JR. | January 10, 2017 | $372,501 | Transfer from Gateway Bank of Central FL account ending in 4841, in the name of Hospital Laboratory Partners to Suntrust account ending in 9949 in the name of RAJ Enterprises of CFL LLC (Pinnacle Labs) |
| THIRTEEN | JORGE PEREZ<br><br>JAMES PORTER, JR. | January 13, 2017 | $2,208,791 | Transfer from Putnam County State Bank account ending in 9924, in the name of Putnam County Memorial Hospital to Gateway Bank of Central FL account ending in 4841, in the name of Hospital Laboratory Partners, LLC |
| FOURTEEN | JAMES PORTER, JR.<br><br>JORGE PEREZ<br><br>RICARDO PEREZ | January 23, 2017 | $500,000 | Transfer from Gateway Bank of Central FL account ending in 4841, in the name of Hospital Laboratory Partners to TD Bank account ending in 0809 in the name of Empower Investment Group LLC |

| Count | Defendant | Approximate Date of Payment | Approximate Amount | Description |
|-------|-----------|------------------------------|--------------------|-------------|
| FIFTEEN | JAMES PORTER, JR.<br><br>CHRISTIAN FLETCHER | January 30, 2017 | $802,053 | Transfer from Gateway Bank of Central FL account ending in 4841, in the name of Hospital Laboratory Partners to Wells Fargo account ending in 3021 in the name of Lifebrite Laboratories LLC |
| SIXTEEN | JAMES PORTER, JR.<br><br>SEAN PORTER | May 15, 2017 | $75,000 | Transfer from Gateway Bank of Central FL account ending in 4841, in the name of Hospital Laboratory Partners to Community Bank & Trust of Florida account ending in 4477 in the name of TYSI LLC |
| SEVENTEEN | JORGE PEREZ<br><br>SETH GUTERMAN<br><br>JAMES PORTER, JR. | April 15, 2016 | $93,328 | Transfer from People's Bank of Graceville account ending in 0377 in the name of Campbellton Graceville Hospital to Suntrust account ending in 9949 in the name of RAJ Enterprises of CFL LLC (Pinnacle Labs) |

| Count | Defendant | Approximate Date of Payment | Approximate Amount | Description |
|---|---|---|---|---|
| EIGHTEEN | JAMES PORTER, JR.<br><br>CHRISTIAN FLETCHER | December 23, 2016 | $1,125,300 | Transfer from Gateway Bank of Central FL account ending in 4841, in the name of Hospital Laboratory Partners LLC to Wells Fargo account ending in 3021, in the name of Lifebrite Laboratories LLC |
| NINETEEN | JORGE PEREZ<br><br>RICARDO PEREZ<br><br>JAMES PORTER, JR. | February 3, 2017 | $1,463,361 | Transfer from Putnam County State Bank account ending in 9924, in the name of Putnam County Memorial Hospital to Gateway Bank of Central FL account ending in 4841, in the name of Hospital Laboratory Partners LLC |
| TWENTY | JAMES PORTER, JR.<br><br>JORGE PEREZ<br><br>RICARDO PEREZ | April 28, 2017 | $1,000,000 | Transfer from Gateway Bank of Central FL account ending in 4841, in the name of Hospital Laboratory Partners LLC to TD Bank account ending in 9018, in the name of Empower HIS LLC |
| TWENTY-ONE | JAMES PORTER, JR.<br><br>JORGE PEREZ<br><br>RICARDO PEREZ | May 22, 2017 | $250,000 | Transfer from Gateway Bank of Central FL account ending in 4841, in the name of Hospital Laboratory Partners LLC to TD Bank account ending in 0809, in the name of Empower Investment Group LLC |

| Count | Defendant | Approximate Date of Payment | Approximate Amount | Description |
|---|---|---|---|---|
| TWENTY-TWO | JAMES PORTER, JR.<br><br>SEAN PORTER | May 22, 2017 | $75,000 | Transfer from Gateway Bank of Central FL account ending in 4841, in the name of Hospital Laboratory Partners to Community Bank & Trust of Florida account ending in 4477 in the name of TYSI LLC |
| TWENTY-THREE | AARON DURALL<br><br>NEISHA ZAFFUTO | December 11, 2017 | $1,715,238 | Transfer from BB&T Bank account ending in 4369, in the name of Durall Capital Holdings LLC to JPMorgan Chase account ending 2011 in in the name of KTL Labs, LLC |

It is further alleged that the specified unlawful activities are conspiracy to commit health care fraud and wire fraud, and health care fraud, in violation of 18 U.S.C. §§ 1349 and 1347.

In violation of 18 U.S.C. §§ 1957(a) and 2.

## FORFEITURE

1.    The allegations contained in Count One are incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 US.C. § 2461(c), and 18 U.S.C. § 982(a)(7).

2.    Upon conviction of a conspiracy of the violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1347, in violation of 18 U.S.C. § 1349, the defendants,

JORGE PEREZ,
RICARDO PEREZ,
SETH GUTERMAN,
AARON DURALL,
JAMES PORTER,
CHRISTIAN FLETCHER,
NEISHA ZAFFUTO,
AARON ALONZO, and
NESTOR ROJAS,

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. §

2461(c), and 18 U.S.C. § 982(a)(7), any property, real or personal, which constitutes or

is derived from proceeds traceable to the offense.

3.      The allegations contained in Counts Two through Six are incorporated

by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 982(a)(7).

4.      Upon conviction of the violation of 18 U.S.C. § 1347, the defendants,

JORGE PEREZ,
RICARDO PEREZ,
SETH GUTERMAN, and
AARON DURALL,

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real

or personal, that constitutes or is derived, directly or indirectly, from gross proceeds

traceable to the commission of the offense.

5.      The allegations contained in Count Seven are incorporated by reference

for the purpose of alleging forfeitures pursuant to 18 U.S.C. § 982(a)(1).

6.      Upon conviction of a violation of 18 U.S.C. § 1956, the defendants,

AARON DURALL
and
NEISHA ZAFFUTO,

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real

or personal, involved in such offense, or any property traceable to such property.

7.      The allegations contained in Count Eight are incorporated by reference

for the purpose of alleging forfeitures pursuant to 18 U.S.C. § 982(a)(1).

8.      Upon conviction of a violation of 18 U.S.C. § 1956, the defendants,

JORGE PEREZ,
RICARDO PEREZ,
JAMES F. PORTER, JR.,
SEAN PORTER,
CHRISTIAN FLETCHER,
SETH GUTERMAN,
AARON DURALL, and
NEISHA ZAFFUTO,

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real

or personal, involved in such offense, or any property traceable to such property.

9.      The allegations contained in Counts Nine and Ten are incorporated by

reference for the purpose of alleging forfeitures pursuant to 18 U.S.C. § 982(a)(1).

10.     Upon conviction of a violation of 18 U.S.C. § 1956, the defendant,

AARON DURALL, shall forfeit to the United States, pursuant to 18 U.S.C. §

982(a)(1), any property, real or personal, involved in such offense, or any property

traceable to such property.

11.     The allegations contained in Counts Eleven through Twenty-Three are incorporated by reference for the purpose of alleging forfeitures pursuant to 18 U.S.C. § 982(a)(1).

12.     Upon conviction of a violation of 18 U.S.C. § 1957, the defendants,

JORGE PEREZ,
RICARDO PEREZ,
SETH GUTERMAN,
AARON DURALL,
NEISHA ZAFFUTO,
JAMES F. PORTER, JR.,
SEAN PORTER, and
CHRISTIAN FLETCHER,

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to such property.

13.     The property to be forfeited includes, but is not limited to, the following:

a.     The sum of at least $46,286,878.58 which represents proceeds defendants JORGE PEREZ and RICARDO PEREZ collectively obtained as a result of the commission of the offenses charged in Counts One through Six, and which proceeds were involved in the commission of the offenses charged in Counts Eight, Eleven, Thirteen, Fourteen, Seventeen, and Nineteen through Twenty-One;

b.     The sum of at least $1,832,820.75 which represents proceeds defendant SETH GUTERMAN obtained as a result of the commission of the offenses charged in Counts One through Six, and which proceeds were involved in the commission of the offenses charged in Counts Eight and Seventeen;

c.     The sum of at least $184,407,671.87 which represents proceeds defendant AARON DURALL obtained as a result of the commission of the offenses charged in Counts One through Six, and which proceeds were involved in the commission of the offenses charged in Counts Ten and Twenty-Three;

31

d.    The sum of at least $10,902,011.30 which represents proceeds defendant NEISHA ZAFFUTO obtained as a result of the commission of the offenses charged in Count One, and which proceeds were involved in the commission of the offenses charged in Counts Seven, Eight and Twenty-Three;

e.    The sum of at least $67,112,729.04 which represents proceeds defendant JAMES PORTER obtained as a result of the commission of the offenses charged in Count One, and which proceeds were involved in the commission of the offenses charged in Counts Eight, Eleven through Twenty-Two;

f.    The sum of at least $3,036,184.26 which represents proceeds defendant SEAN PORTER obtained as property involved in the commission of the offenses charged in Counts Eight, Sixteen and Twenty-Two;

g.    The sum of at least $75,972,061.86 which represents proceeds defendant CHRISTIAN FLETCHER obtained as a result of the commission of the offenses charged in Count One, and which proceeds were involved in the commission of the offenses charged in Counts Eight, Fifteen and Eighteen;

h.    The sum of at least $8,657,647.44 which represents proceeds defendants AARON ALONZO and NESTOR ROJAS collectively obtained as a result of the commission of the offenses charged in Count;

i.    Real property (Record Owner: Empower Investment Group) including all improvements thereon and appurtenances thereto, located at 96000 Overseas Highway, Unit W-31, Key Largo, Monroe County, Florida 33037, the legal description for which is:

Unit No. W-31 of Buttonwood Bay No. 19, a Condominium, according to The Declaration of Condominium recorded in Official Records Book 795, Page 2192, and all exhibits and amendments thereof, Public Records of Monroe County, Florida; together with the undivided interest in the common elements designated in Condominium Declaration appurtenant thereto, together with Boat Slip Number 244;

j.    Real property, including all improvements thereon and appurtenances thereto, located at 96000 Overseas Highway, Unit M-4, Key Largo, Monroe County, Florida 33037, the legal description for which is:

Unit No. M-4 of Buttonwood Bay No. 7, a Condominium, according to the Declaration of Condominium recorded in Official Records Book 582, Page 803, and all exhibits and amendments thereof, Public Records of Monroe County, Florida

Record Owners: Jorge Perez & Liansy C. Carbonell, for a joint life estate, with a remainder to Christina Ada Perez and Elizabeth Estrella Perez, as joint tenants with the right of survivorship;

k.    Real Property, including all improvements thereon and appurtenances thereto, located at 13820 SW 142 Avenue, Miami, Miami-Dade County, Florida 33186, the legal description for which is:

Condominium Unit No. 13820, of Tamiair Park Condominium No. 1, a Condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 11140, Page 905, of the Public Records of Miami-Dade County, Florida, together with an undivided interest in the common elements appurtenant thereto

Record Owner: Empower Investment Group LLC

l.    Real Property, including all improvements thereon and appurtenances thereto, located at 15424 SW 175 Street, Miami, Miami-Dade County, Florida 33187, the legal description for which is:

Lot 13, in Block 25, of VENETIAN PARC WEST, according to the Plat thereof, as recorded in Plat Book 170, Page 27, of the Public Records of Miami-Dade County, Florida

Record Owner: Empower Investment Group LLC;

m.   Real Property, including all improvements thereon and appurtenances thereto, located at 15434 SW 175 Street,

Miami, Miami-Dade County, Florida 33187, the legal description for which is:

Lot 14, in Block 25, of VENETIAN PARC WEST, according to the Plat thereof, as recorded in Plat Book 170, Page 27, of the Public Records of Miami-Dade County, Florida

Record Owner: Empower Investment Group LLC;

n.   Real Property, including all improvements thereon and appurtenances thereto, located at 7822 Marvana Lane, Parkland, Broward County, Florida 33076, the legal description for which is:

Lot 23, Parkland Golf and Country Club Pod 20 Replat, according to the Plat thereof as recorded in Plat Book 180, Pages 61 through 64, inclusive, of the Public Records of Broward County, Florida

Record Owners: Aaron L. Durall & Melanie M. Durall;

o.   Real Property, including all improvements thereon and appurtenances thereto, located at 9447 Satinleaf Place, Parkland, Broward County, Florida 33076, the legal description for which is:

Lot 8, Block G, PARKLAND GOLF AND COUNTRY CLUB REPLAT #1, according to the plat thereof as recorded in Plat Book 172, Pages 182-206, of the Public Records of Broward County, Florida

Record Owner: Dalton Durall, Jr.;

p.   Real Property, including all improvements thereon and appurtenances thereto, located at 4123 Little Point, Avon, Eagle County, Colorado 81620, the legal description for which is:

Lot 12N, a resubdivision of Lot 12, a resubdivision of lots 12 and 13, Wildridge, according to that plat recorded May 12, 2010 under reception no. 201009073, County of Eagle, State of Colorado

Record Owner: James Porter;

q.   Real Property, including all improvements thereon and appurtenances thereto, located at 1280 N. Circle Drive, Crystal River, Citrus County, Florida 34429, the legal description for which is:

Lot 23, SUNSET SHORES ADDITION TO WOODWARD PARK, according to the plat thereof as recorded in Plat Book 2, page 140, Public Records of Citrus County, Florida

Record Owners: Sean L. Porter and Holly Porter;

r.   Real Property, including all improvements thereon and appurtenances thereto, located at 3540 Woodhaven Road NW, Atlanta, Fulton County, Georgia 30305, the legal description for which is:

All that tract or parcel of land lying and being in Land Lot 141, 17th District, Fulton County, Georgia as shown on that survey of 3540 Woodhaven Road for Donald M. Leeber, III by Georgia Land Surveying Co., Inc., certified by Josh L. Lewis, IV, Georgia Registered Land Surveyor No. 3028, dated February 25, 2010, being more particularly described as follows: Beginning at a one-half inch rebar found on the northwestern Right-of-Way of Woodhaven Road (fifty foot right-of-way), said point being 969.810 feet as measured southwesterly along the northwestern right-of-way of said Woodhaven Road from the intersection of the northwestern right-of-way of said Woodhaven Road and the southwestern right of way Tuxedo Road (fifty foot right-of-way), leaving said right-of-way, thence North 65 degrees 49 minutes 54 seconds West along the southwestern boundary of Lot 1, Woodhaven Estates a distance of 562.33 feet to a three-quarter inch open top pipe found; thence South 01 degrees 46 minutes 29 seconds West along an existing fence line a distance of 423.41 feet to a three-quarter inch open to pipe found; thence South 77 degrees 56 minutes 55 seconds East along the northeastern boundary of Lot 3, Woodhaven Estates a distance of 446.87 feet to a three-quarter inch open top pipe found on the northwestern right-of-way of said Woodhaven Road; thence North 14 degrees 50 minutes 31 seconds East along the northwestern right-of-way of said Woodhaven Road a distance of 34.32 feet to a point; continuing thence in a northeasterly direction along the

35

northwestern right-of-way of said Woodhaven Road an arc length of 265.65 feet (said arc being subtended by a chord having a chord bearing North 17 degrees 36 minutes 45 seconds East, a chord length of 266.66 feet, a radius of 2839.48 feet and a central angle of 05 degrees 21 minutes 37 seconds) to a one-half inch rebar found on the northwestern right-of-way of said Woodhaven Road, said point of Beginning; Being all of Lot 2, Woodhaven Estates, Plat Book 28, Page 57, Fulton County, Georgia Records; known as 3540 Woodhaven Road according to the current system of numbering houses in the City of Atlanta and containing 4.041 acres. Being the same property as described at Deed Book 1829, Page 5; Deed Book 48503; Page 237 and Deed Book 48503, Page 239, Fulton County, Georgia Records

Record Owner: 3540 Woodhaven Road, LLC;

s.   Real Property, including all improvements thereon and appurtenances thereto, located at 9705 NW 67 Court, Tamarac, Broward County, Florida 33321-3315, the legal description for which is:

Lot 9, Block 289, of WESTWOOD COMMUNITY TWO, a Subdivision, according to the Plat thereof as recorded in Plat Book 76, page(s) 46, of the Public Records of Broward County, Florida

Record Owners: Neisha Zaffuto & Gerald Bruno;

t.   Real Property, including all improvements thereon and appurtenances thereto, located at 9805 NW 67 Court, Tamarac, Broward County, Florida 33321-3317, the legal description for which is:

Lot 15, Block 289, WESTWOOD COMMUNITY TWO, a Subdivision, according to the Plat thereof as recorded in Plat Book 76, page(s) 46, of the Public Records of Broward County, Florida

Record Owner: Neisha Carter Zaffuto;

u.   Real Property, including all improvements thereon and appurtenances thereto, located at 13851 Stirling Road, Southwest Ranches, Broward County, Florida 33330, the legal description for which is:

The West one-quarter (W ¼) of Tracts 13, 14, 15 and 16 in Section 34, Township 50 South, Range 40 East, The Everglade Sugar & Land Company Subdivision, according to the Plat thereof as recorded in Plat Book 1, Page 152, of the Public Records of Dade County, Florida, LESS road right-of-way

Record Owner: Joan Gordon as Trustee of the Stirling Estate Trust;

v.   2017 Range Rover, VIN SALGS2FE0HA325026
Registered to Aaron Durall;

w.   2015 Ferrari 458 Speciale Spider, VIN ZFF78VHA0F0214434
Registered to Aaron L. Durall;

x.   2015 Mercedes Benz S550, VIN WDDUG8CB7FA191689
Registered to Aaron Durall;

y.   2015 GMC Sierra crew cab truck, VIN: 3GTU2VECXFG509514
Registered to Sean Lee Porter;

z.   2017 White McLaren 570GT, VIN: SBM13GAA2HW002070
Registered to Christian Al Fletcher;

aa.   2014 Black Rolls Royce Wraith, VIN: SCA665C56EUX84382
Registered to Neisha Suzanne Zaffuto;

dd.   2017 Cobia 277 Center Console vessel, HIN CBACW046J617
Registered to Empower Investment Group LLC;

bb.   2016 24' Malibu M235 vessel, HIN: MB2V9179E616
Registered to James Frederick Porter, Jr.;

cc.   2017 23' 5" Malibu M235 vessel, HIN: MB2V4052E717
Registered to James Frederick Porter, Jr. or Karol Renee Porter;

dd.   Audemars Piguet Royal Oak Lady Offshore Women's Watch
(seized from Aaron Durall);

ee.   Tiffany & Company diamond 3.280 carat solitaire ring (seized
from Aaron Durall);

ff.  Patek Philippe 5940G-010 men's watch (seized from Aaron Durall);

gg.  14 karat 26.21 ctw 7" 100ptr Prong set round bracelet (seized from Christian Fletcher); and

hh.  18 karat white gold custom diamond engagement ring, VS clarity side stones 1.40 carats TW, with 7.27 carats color S12 clarity certified cushion cut diamonds (seized from Christian Fletcher).

14.  If any of the property described above, as a result of any act or omission of the defendants:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property under the provisions of 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), and as incorporated by 18 U.S.C. § 982(b)(1).

A TRUE BILL

*Deliorah Gianoulis Heald*

Foreperson

MARIA CHAPA LOPEZ
United States Attorney

Tysen Duva
Assistant United States Attorney

Frank Talbot
Assistant United States Attorney
Chief, Jacksonville Division

39

_James V. Hayes (F/b/o)_

Allan Medina
Deputy Chief
Criminal Division, Fraud Section
U.S. Department of Justice

_James V. Hayes_

Gary A. Winters
James V. Hayes
Trial Attorneys
Criminal Division, Fraud Section
U.S. Department of Justice

FORM OBD-34
6/16/20 Revised

No.

# UNITED STATES DISTRICT COURT
### Middle District of Florida
### Jacksonville Division

## THE UNITED STATES OF AMERICA

vs.

JORGE PEREZ
RICARDO PEREZ
SETH GUTERMAN
AARON DURALL
JAMES F. PORTER, JR
SEAN PORTER
CHRISTIAN FLETCHER
NEISHA ZAFFUTO
AARON ALONZO
NESTOR ROJAS

## INDICTMENT
Violations:   18 U.S.C. §§ 1349, 1347, 1956(h), 1956(a)(1)(A)(i), and 1957

A true bill,

_Deborah Granoulis Heald_
Foreperson

Filed in open court this _17th_ day of June, 2020.

_____
Clerk

Bail    $_____

GPO 863 525