UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                             Case No. 3:20-cr-86-TJC-JBT

JORGE PEREZ, et al.

**UNITED STATES' OPPOSITION TO DEFENDANT
AARON DURALL'S MOTION TO BAR THE GOVERNMENT
FROM INTRODUCING EVIDENCE OR FOR A CONTINUANCE**

The Government hereby submits this opposition to Defendant Aaron Durall's

Motion to Bar the Government from Introducing Evidence at Trial that Amounts to

a Prejudicial Variance or Constructive Amendment of the Indictment, or, in the

Alternative, for a Continuance of the Trial to Enable Defendant Aaron Durall to

Prepare for the Government's Belated Announcement of a New Theory to Prove

Fraud and Money Laundering (Doc. 620). Durall's hyperbolic claims that the

Government has radically changed its fraud and money laundering theories are far

off the mark, and do not merit either a restriction of the Government's evidence or a

continuance.

A.      **The Government Has Not Announced a New Fraud Theory**

Durall seizes on a footnote in the Government's opposition to Sean Porter's

Motion in Limine (Doc. 595 at 4, n.3) to claim that the Government has decided to

advance an entirely new and different theory of fraud as to him, amounting to a

constructive amendment of the indictment. *See* Doc. 620 at 2-3 (citing the footnote

alone to claim that the government's theory of fraud "is something entirely different"). The Government has done no such thing. The Government simply referred to evidence that one of the four hospitals through which the fraudulent billing scheme was perpetrated, Chestatee Regional Hospital, was capable of performing more testing than the other three hospitals.[1] Moreover, the Government will present evidence at trial that Reliance Labs, which sent urine samples to Chestatee to be tested, was capable of testing, and did test, all the samples that had initially been referred to it from sources such as treatment centers and sober homes — meaning Reliance had no "overflow" testing that it needed to refer to Chestatee for either qualitative or quantitative testing. Defendant Durall has known this evidence existed since the Government made its initial discovery production in 2020, as it is contained in reports of witness interviews the government turned over in its initial discovery production.

In presenting evidence that Reliance could test every sample sent to it, which supports an inference that samples Reliance sent to Chestatee for testing had already been tested at Reliance, the Government is not offering a new theory of fraud as to Durall. The Government's fraud theory has been consistent throughout — and is fully comprehensible to Durall — as Durall's recitation of the Indictment and the

---

[1] Regrettably, the Government realized, upon reviewing Defendant Durall's motion on April 26, that it had made an error in the footnote, which it now brings to the Court's attention and corrects. The Government stated that Chestatee only billed for qualitative (positive/negative) drug screening, whereas in fact billing data shows that Chestatee billed for quantitative (confirmatory) testing as well. The point remains, though, that Chestatee had capacity to perform substantially more testing at the hospital lab than the other three hospitals, CGH, RGH and Putnam.

various pleadings outlining the government's fraud theory shows (Doc. 620, at 5-10). The fraud involved falsely submitting claims through the rural hospitals for testing that was mostly performed at independent laboratories, and in submitting claims for medically unnecessary testing. *See* Durall's Motion, Doc. 620, at 9 (quoting from Doc. 477, Government Memorandum Opposing Durall's Renewed Motion for a Bill of Particulars).

At no time did the Government assert that *every single test* billed through the rural hospitals was performed at an outside laboratory. To the contrary, beginning with the Superseding Indictment, the theory has been that *some* testing was indeed performed at the hospitals. *See* Superseding Indictment ¶ 371 (alleging that the defendants caused fraudulent claims to be submitted through the rural hospitals in order to capture their high in-network reimbursement rates, rather than receive the far lower reimbursements that would have been paid to the independent, out-of-network labs "where *most* of the testing took place") (emphasis added); Government's Opposition to Defendants Fletcher and Durall's Motion to Dismiss (Doc. 224), at 4 (fraud involved submitting claims under hospitals' NPI and Tax ID numbers, and omitting "any mention of the independent labs where *much* of the actual testing took place") (emphasis added); Government's Opposition to Porters' Motion to Dismiss (Doc. 276), at 1-2 (fraud involved "false submission of claims as if services were performed by the hospitals coupled with the omission of any mention of the independent, non-network labs as the locus of *most* of the testing") (emphasis added); United States' Memorandum Opposing Durall's Renewed Motion for a Bill

of Particulars (Doc. 477), at 1 (fraud involved representing that testing was

performed at rural hospitals "*when in fact most* of the testing was performed at outside

laboratories") (emphasis added).[2]

This fact, which has never been in dispute, is in no way inconsistent with the

Government's fraud theory: the evidence will show that over the entire span of the

conspiracy encompassing the serial use of four hospitals to carry out the scheme, the

defendants billed and were paid primarily for testing that the hospitals could not and

did not do and that on the whole lacked medical necessity, thereby making repeated

material misrepresentations in order to obtain money to which they were not

entitled.

Importantly, Durall did not just participate in the scheme in connection with

Chestatee. The evidence will show that starting in 2015, long before he purchased

Chestatee to further the urine drug testing and blood testing scheme, Reliance was

performing quantitative (confirmatory) urine drug tests that were fraudulently billed

to insurers through Campbellton-Graceville Hospital ("CGH") as though they had

been performed at CGH. CGH had no ability to perform a quantitative

(confirmatory) urine drug test. The suggestion that the Government has upended its

entire theory of how Durall and other defendants carried out the fraud fails to take

---

[2] For this reason, Durall is wrong in suggesting that the Government changed its theory of prosecution when the defense revealed that it had been able to download information from a Campbellton-Graceville Hospital server purportedly showing 80,000 test results for urine tests performed at the hospital. Doc. 620, at 10. Any evidence that tests were performed at CGH or any other hospital is not "exculpatory," because the Government has never alleged anything to the contrary.

into account the larger picture of the multi-year conspiracy alleged in the Superseding Indictment.

To return to the footnote Durall focuses on, it merely notes that Chestatee performed more testing than the other three hospitals, where billings were far more heavily weighted toward quantitative urine drug tests and other types of tests that those hospitals could not and did not perform. And it alludes to evidence the Government will present showing that the construct of using a rural hospital lab like Chestatee's as a "reference lab" to perform and bill for tests that some other lab (*i.e.*, Reliance) could not perform on its own is false, artificial, and part of the larger overall scheme to use the rural hospitals as billing "shells" to fraudulently obtain in-network reimbursements. The Government is not advancing a new theory that Durall and Durall alone engaged in the fraud through "double testing" at Reliance and Chestatee. Put simply, the Government described a piece of its proof that is entirely consistent with its overall theory about how Durall and other defendants used rural hospitals. There is no basis for preemptively excluding this evidence before the Government has even offered it due to a concern about constructive amendment, or giving Durall a continuance to enable him to respond.

Durall has known about this evidence since 2020 when it was originally disclosed in discovery. The relevance of this evidence to counter an anticipated defense became increasingly pertinent when Durall announced during the April 5 Status Conference that he now has evidence via the Lab Information System (LIS) from all four hospitals showing the tests that were run at all four hospitals. The

defense even noticed a new expert, Daniel Simao (a former Empower HIS employee, which was not included in the expert notice, Doc. 550) as the individual who will testify about the LIS systems. It was not until Friday, April 22 that defense counsel provided this material to the government. Thus in response, the Government expects to introduce evidence that Reliance Labs tested every sample that it received (both qualitative and quantitative tests), had no "overflow" testing in need of a "reference lab," and that Reliance and the other independent labs had Virtual Private Network (VPN) access to the hospital LIS systems to upload test results, ostensibly making it appear that the hospitals were running the more expensive quantitative tests — which the hospitals overwhelmingly could not run.

Thus, even with the eleventh hour disclosure by the defendants of the hospital LIS systems, the fraud theory remains the same — the defendants tested specimens at independent labs and billed as if the testing was performed at the small rural hospitals. This evidence of the capacity of the independent labs to test (when compared to the unsophisticated hospital labs) is a factual underpinning of the defendants' shell game to make material misrepresentation and omissions in the billing to fraudulently bill insurance companies to gain wealth.

## B.   There is No New Predicate Offense for Money Laundering

Durall contends that the Government introduced a new money laundering theory in its Opposition to Aaron Durall's Renewed Motion to Strike Surplusage (Doc. 596), specifically, that the Government would rely on predicate offenses not alleged in the Superseding Indictment. *See* Doc. 610, at 3-4. The argument reflects

confusion of the requirement that the defendant know the property involved in a financial transaction represented the proceeds of "some form of unlawful activity" with the distinct requirement that the financial transaction in fact involve the proceeds of "specified unlawful activity" (SUA). *See* Eleventh Circuit Criminal Pattern Jury Instruction O74.1 (for promotional money laundering, government must separately prove the defendant knew the property was the proceeds of some kind of unlawful activity, and that the property did come from the specified unlawful activity alleged in the indictment) (emphasis added). The "unlawful activity" that generated the proceeds may be a felony violation of federal, state, or foreign law, *see* 18 U.S.C. § 1956(c)(1), whereas the crimes that qualify as SUA are specifically delineated in the statute. *Id*. § 1956(c)(7).

The Government explained in its response to the surplusage motion that the allegation of kickbacks contained in the Superseding Indictment is relevant both to the health care and wire fraud conspiracy charge and to the money laundering charges, the latter of which involve conspiracy and substantive counts. Doc. 596, at 2-3. The Government further explained how the payment of kickbacks is relevant to the money laundering charges (and consequently not surplusage): the payment of kickbacks to induce referrals to a health care facility was illegal under Florida law, and therefore the Government can prove knowledge that the proceeds derived from "some form of unlawful activity" by proof that the defendant knew the proceeds derived from violation of the Florida anti-kickback law. This element is different than the requirement that the Government prove that the proceeds *actually* derived

7

from SUA (which Durall refers to as "predicate offenses") and which are alleged in the Superseding Indictment to be conspiracy to commit health care fraud and wire fraud, and health care fraud. *See United States v. Montague*, 29 F.3d 317, 322 (7th Cir. 1994) (defendant knew proceeds derived from state prostitution offense; SUA was Travel Act). There is no allegation in the Superseding Indictment of the form of unlawful activity the defendants are alleged to have known generated the proceeds, and thus the Government satisfying this requirement with knowledge that the proceeds were a violation of the Florida anti-kickback law introduces no amendment to the Superseding Indictment.

WHEREFORE, for the foregoing reasons, the government respectfully requests that Durall's motion be denied.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:   /s/ Tysen Duva
TYSEN DUVA
Assistant United States Attorney
Florida Bar No. 0603511
300 N. Hogan Street, Suite 700
Jacksonville, Florida 32202
Telephone:   (904) 301-6300
Facsimile:   (904) 301-6310
E-mail:  Tysen.Duva@usdoj.gov

8

JOSEPH S. BEEMSTERBOER
ACTING CHIEF
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION

By:  */s/ James V. Hayes*
JAMES V. HAYES (FL Bar # A5501717)
Senior Litigation Counsel
GARY A. WINTERS (FL Bar # A5501852)
Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, NW
Washington, DC 20005
Tel: (202) 598-2382
Email: Gary.Winters@usdoj.gov
James.Hayes@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on April 28, 2022, a true and correct copy of the foregoing

was filed and served on all counsel via the CM/ECF system.

*/s/ Gary A. Winters*
GARY A. WINTERS
Trial Attorney
Criminal Division, Fraud Section